Good afternoon, ladies and gentlemen, it's time set for argument. And before we proceed, Judge McKeon and I would like to thank Judge Don Molloy for joining us as a visiting judge. It's good to have two Montanans on the panel and a Wyoming native. So thanks, Don, for coming up and helping us out as you have so many times before. With that, we'll proceed to the first case on the oral argument calendar, which is Gross v. CitiMortgage. You may proceed. Good afternoon, Your Honors. My name is David Shammy, and I represent the appellant, Marshall Gross, in this matter. As a procedural matter, I guess I'm uncertain whether the government has been given three minutes of my time or whether they will have their own time to speak. I think we've given you 15 minutes, and the government, five. Perfect. Thank you. I'd like to reserve three minutes for rebuttal of my time. Thank you. Your Honors, I'd like to start a little out of order because what's important, I think, for this panel to understand, I think, ultimately, is that no matter what the panel decides as far as the personal obligation, liability on this debt, whether CitiMortgage accurately reported a hypothetical debt or a debt that existed on its books, whether that liability still exists somehow, the reporting of that debt on Mr. Gross' credit report at a minimum is materially misleading because, as this Court has found in both Dorman and Carvalho, something can be inaccurate if it is misleading, and it is misleading if it has a material impact on credit-making decisions. And what I want to just start by saying is let's assume for a moment that CitiMortgage's argument that somehow this debt still exists and that Mr. Gross still owes it, absent reporting that allows creditors to understand that while there's a legal debt that is still owed by Mr. Gross, that CitiMortgage was unable to collect on that debt by reporting the balance, by reporting past due balances, as well as an outstanding balance, and reporting that Mr. Gross was late, 120 to 180 days late, every month from March of 2013 or June of misleading impression to prospective creditors because ultimately CitiMortgage was not trying to collect that debt, and ultimately in May of 2018, they reported, despite Mr. Gross making no such payment to them, they reported the account as charged off but also paid. So even if we were to accept that he still owed the debt legally, the reporting was misleading. However, we would wholeheartedly disagree, and we think that the overwhelming majority of legal authority makes it clear that CitiMortgage's contention that Mr. Gross still owes this debt is simply meritless, and all we need to do really is look at the Arizona Supreme Court's decision in Baker v. Gardner from 1989. The Supreme Court and the District Court agreed and also concluded that the Supreme Court of Arizona found that the legislature's objective in enacting the Arizona Anti-Deficiency Statute was to, and the word is literally, abolish the personal liability of those who give trust deeds encumbering properties. So if we take the statute and the Arizona Supreme Court's interpretation of that statute and give it the weight that it deserves and that it actually holds in the state of Arizona, then it's unquestioned that Mr. Gross did not have personal liability on this debt, and that's consistent with the way CitiMortgage treated the debt. They never tried to send him collection letters, they didn't call for him to pay, and ultimately he didn't pay, and didn't even know that this was happening to him until he tried to apply for a mortgage in late 2017, when at that point he began his efforts to reach out to CitiMortgage to try to find out what the heck was going on. All that information's in the record. It's clear that CitiMortgage, in their own records, understood that the property had been foreclosed upon through a trustee sale, that different owners owned the property, and ultimately they couldn't get there, that one department wasn't understanding the other apparently, and they let that linger on, continued to try to report it, despite disputes that were sent to them by Mr. Gross. So we would argue that, first of all, it's patently inaccurate to report that he owed a balance, because credit reports, Your Honors, they report personal obligations of consumers. What is being reported is what Mr. Gross has contracted to be obligated to pay, whether it's medical services where he agreed to pay in exchange for medical service, utility bills, cell phone bills, credit cards, mortgages, home loans, all of those are consensual debts incurred by a consumer where they have an obligation to pay. The moment his obligation to pay ceased, the debt was abolished, as it relates to Mr. Gross. Reporting it on his credit report is not only materially misleading, it is patently inaccurate. Even if the debt still existed somewhere on CitiMortgage's books, that doesn't mean that Mr. Gross had a personal obligation to pay it, and by reporting it on his credit report, that's what CitiMortgage was saying. So it's not only misleading, it's also false. And worse yet, what they were telling prospective creditors is that Mr. Gross was ignoring his monthly payment obligations each and every month. That entire time from 2013 on, they were saying he's 180 days late in August of 2013. He's 180 days late in December of 2014. He's 180 days late in March of 2018. And when Mr. Gross disputed, they verified that he was in fact past due, they updated the balance to make it larger, and they continued to report him as 180 days late. Now CitiMortgage asks this court, asks your honors, for a ruling, for a finding that they are not obligated to make legal determinations. That argument is nonsense. You are talking about credit reporting of debts, the basis of which are contract law. What CitiMortgage does every month, and what all furnishers do every month, is report legal obligations, their interpretation of those legal obligations. They assess late fees based on contract law, and according to CitiMortgage, they were withholding the charge-off based on their interpretation of the Servicemembers Relief Act. So literally, CitiMortgage is making legal determinations each and every month they credit report. So is that why the Servicemembers Relief Act is the reason, according to Citi, that it wasn't written off earlier? Well, they were wrong about their interpretation of it, but that is the justification they gave for why they didn't charge it off. But when they charged it off on their books, your honors, it's immaterial for our purposes because they had no right to credit report that charge-off, not only at all, but especially when they did. If they wanted to charge it off for credit reporting purposes, that needed to happen at the time of the trustee sale in 2013. Now they want to keep it on their books for accounting purposes. That's a different issue altogether. But ultimately, from a credit reporting standpoint, literally every month the credit reporting agencies are getting information from furnishers like Citi where they are being asked to make legal determinations. In fact, every time CitiMortgage makes a report, sends a report, they are saying, we have determined that this is accurate. We have verified the accuracy, and you can only do that by making a legal determination that the debt is owed, that the balance is accurate, and the amount you're reporting is accurate. Well, is your position that the debt was owed, but ... Absolutely not. Absolutely not. It is our position that at the time of the trustee sale, according to Arizona law and the Supreme Court of Arizona and Baker v. Gardner, when somebody gives a trust deed, a deed of trust on a 2 1⁄2 acre parcel, single residence, 2 1⁄2 acre parcel or less, they give that trust deed, they give it in exchange for the non-recourse nature of that loan. So, in the event that the lender takes action to, I say foreclose, but to act on the deed of trust and have a trustee sale, they're giving up their right to collect any deficiency or to seek any payment from the consumer, and that's directly from the Arizona Supreme Court. In 1989, this isn't some recent decision. This has been the law and confirmed the law of the land since 1989 at a minimum. Counsel, you would agree that the report said that the debt was disputed, correct? I would agree that they eventually did report that the debt was disputed, but that— That was accurate. You did dispute the debt. Of course. It was accurate that Mr. Gross had disputed the debt, but that has no bearing on the rest of the information that is being reported, and that is that he's 180 days late and that he owes a balance. The fact that you're saying the consumer's disputing the debt doesn't say why the consumer's disputing the debt. And the truth is, Citi can't reasonably contend that they were unaware of the Arizona Anti-Deficiency Statute. They literally are a multi-trillion dollar company that is in the business of giving loans and mortgages to consumers throughout this country. They have to be aware of the laws. They write their loan agreement, and even their loan documents say that it's subject to the laws of Arizona. So you have to follow the laws of Arizona, not only Mr. Gross, but also Citi Mortgage. Would you address the damage issue? Of course. So Mr. Gross testified, not only on the issue of emotional distress, because he was newly married, had a baby, living in a one-bedroom apartment, and specifically pointed out that he was denied a mortgage. He ultimately did get a mortgage, but that was months later after living in a one-bedroom apartment with his brand-new baby, and ultimately got approved for a mortgage. But they had to do a manual underwriting. Literally had to have somebody look at it manually and say, okay, we understand that Citi Mortgage is screwing this up, and we're going to give you the mortgage anyway. But that was many, many months later. And so he lost the home, lost the mortgage, and ultimately was able to get it done months later, but that doesn't solve his damages. His damages don't become moot simply because he eventually got what he sought. And there's plenty of evidence in the record regarding emotional distress on top of the credit denials. John, we've got about three minutes, 30 seconds, do you want to reserve? I'm going to take the last 30 seconds before I reserve just to say, with respect to the reasonableness of their investigation, Citi Mortgage doesn't actually address Mr. Gross's dispute. He disputes. He says he has an 80-20 loan that was foreclosed upon, and Citi Mortgage's investigation is to look to see whether he signed the note. Mr. Gross didn't dispute that he had a mortgage. Looking to see if he signed the note, looking to see if he filed bankruptcy doesn't meaningfully address the dispute. It doesn't even come close to meaningfully addressing the dispute. I'll save the last of my time. Thank you, counsel. Thank you, Mr. Blum. May it please the Court, Karen Blum on behalf of the Amicus Consumer Financial Protection Bureau, CFPB. In the last year alone, CFPB received over 300,000 complaints related to credit or consumer reporting. The most common issues identified were incorrect information reported and problems with companies' investigations. Each consumer who faces detrimental information remaining on a credit report can face dramatic consequences, including restricted access to credit, employment opportunities, housing, insurance, and other programs that assess credit reports as part of an application process. Congress has recognized the importance of fair and accurate credit reporting, and to that end, the Fair Credit Reporting Act required furnishers of information to consumer reporting agencies who received notice from such agency about a dispute related to the completeness or accuracy of information they furnished to conduct an investigation with respect to the disputed information. Congress did not exempt from this requirement disputes that could be categorized as legal, and this Court has never done so. Rather, this Court has repeatedly emphasized that the test for whether furnisher investigations comply with the congressional mandate is if they are reasonable. Reasonableness is defined in light of the nature and extent of the information that the CRA provided to the furnisher, and this flexible test accounts for furnishers' institutional competencies and the specific facts of individual disputes. In contrast, the categorical exemption for legal disputes upon which the District Court relied is inconsistent to the text and purpose of the FCRA, would be hard to implement, and would lead furnishers to evade their legal obligation to investigate disputes if they could be labeled as legal in nature. So you, is it the CFPB's position then that Chang is wrongly decided? The District Court extended Chang beyond the way Chang reads on its face. The District Court said that... No, I mean, first answer my question as to whether you think the First Circuit case was wrongly decided, and then you can talk about what the District Court did or didn't do within the context of Chang. To the extent that Chang is being used to say that the FCRA does not impose on furnishers the duty to investigate legal disputes, we do believe that's incorrect. Your answer suggests that you don't think Chang says that. On its face, Chang excused CRAs and furnishers for having to conclusively adjudicate legal disputes, and there's a difference between having to conclusively adjudicate something and having to investigate it. The statute requires furnishers to reasonably investigate disputes. It doesn't necessarily require that they reach a resolution of them. So where a dispute might raise a really complicated legal issue, it might be reasonable for a furnisher to investigate it, to talk to their in-house experts, to see what prior research they may have done on this issue, and then make a determination, even if that's not the same kind of determination a court would make, to conclusively adjudicate liability, for example. So basically, if I understand your answer, it is that if Chang is interpreted the way you say it should be interpreted, you don't think it was wrongly decided, but if the interpretation of Chang is different, you think it was. That's correct. Go ahead. And Chang is also interesting because the cases Chang relied on were cases about consumer reporting agencies, which again was what this court was dealing with in Carvalho, and there's a big difference between the responsibilities and competencies of furnishers and of CRAs. Congress recognized this. It imposed a scheme that reflected those differences so that consumers report disputes to CRAs. They necessarily have to provide those disputes to the furnishers who courts have repeatedly recognized are in a better position to investigate those disputes because, as Mr. Chami mentioned, they make these determinations all the time. And so Chang elided those differences, and that's one of the other reasons that we think that that decision should at least be distinguished, if not determined to be incorrect. Is there any other circuit court that has used this legal factual distinction with respect to furnishers, to your knowledge? Who has relied on it the way this court is being asked to? Is that the question? Well, no. Who has made this distinction with respect to furnishers, not credit reporting agencies? I'm not sure. In at least a 2019 case, there was a district court said that no other court has done so. Yeah, I asked about circuit court, but you just don't know at this point. Yes, I'm not aware of one right now. I think there's some indication that the Sixth Circuit might have, but I'm not aware of one conclusively. Well, thank you, counsel. Your time has expired. We'll hear from Citibank. And why don't you put on 20 minutes to equal the time? Thank you, Your Honor. May it please the Court, Lee Marshall for Citibank. Your Honor, I'm not aware of another circuit-level decision that has made that same distinction in the context of furnishers. I don't believe that there's any reason to define the word inaccurate differently in the context of credit reporting agencies versus furnishers. In fact, the statutory language, when you look at 1681I, which is really where it talks about how furnishers are supposed to look at disputes, versus 1681S2, which talk—I'm sorry, credit reporting agencies, 1681S2 is furnishers, they both use the same language. It's inaccurate or incomplete, or uses the word accurate or complete, the converse. And there's no reason to say that Congress meant one thing with those words when it comes to credit reporting agencies, and then another thing with respect to furnishers. So I— I don't have the relevant information, et cetera, but the reasonableness—would you agree that the reasonableness of that investigation would vary, one, with the facts, and also could be different between a furnisher that has a direct relationship with the debtor and a consumer reporting agency, which has no such relationship? I don't really believe so, Your Honor. I think in either case, you're basically asking either the credit reporting agency in one instance or the furnisher in the other instance to, you know, basically do a legal analysis of the situation and reach a legal conclusion. And I don't think that the—either the text or the structure of the statute requires that. Moreover, I think— Well, you're saying—I don't understand that. You just told me they're both required to make a legal analysis? No, I'm saying I don't believe that either is required to make that analysis. And yet, if you are a bank, as your client is, that is holding the debt, then you know what the relationship is between your bank and your customer, or the debtor, correct? Certainly, you know what's in the date of trust and what's in the mortgage loan, absolutely. And you know that that's, in this case, governed by Arizona law, correct? Yes. And the bank, presumably, doesn't even need a lawyer to tell it that it's governed by the Arizona's anti-deficiency statute, correct? Well, I don't know that that's so clear, Your Honor. I think that when you are looking at a number of factors on that, you have to look at the certainly the issues that Appellant's attorney mentioned. You also have to look at whether it's a purchased money loan. You have to look. So I'm not sure that whether or not, you know, that is something that would not require any type of legal analysis. Just because it might require legal, I mean, it's factual in terms of what is the relationship, what are the documents, what are they governed by. All that information, whether you call it legal or factual, that is within the ambit of the information that the bank holds, correct? I don't, I wouldn't think so. I'm having trouble because you keep in your brief and otherwise, well, we can't, how could we know this? Possibly that's a legal question. We don't, we aren't a court, we're making, not making a legal judgment. But when you report the debt as still owing by the debtor, when in fact it's been abolished under the statute, and if not abolished, it's then been written off by you, so it's no longer outstanding. What is the legal justification for that as we now have come to this appeal? Well, let me be very clear. There is a difference between whether or not the borrower would have a defense to a collection action under the anti-deficiency statute and whether the debt is still existing. And the case law is quite clear on that distinction, and the district court cited a number of cases on pages 11 through 12 of its opinion, clearly making that distinction. Appellant's attorney cited the Baker case for the proposition that the anti-deficiency statute was intended to abolish liability, but as the cases that the district court cited say the absence of personal liability is not equivalent to the absence of the debt. And the court went on quite a bit. The anti-deficiency statutes that do attempt to abolish the debt, such as the New York one, Your Honor, that one says that proceeds of a sale and a foreclosure shall be deemed to be in full satisfaction of the mortgage debt, or the current version of the California anti-deficiency statute, after it was amended, now says no debt is owed. In contrast, the Arizona anti-deficiency statute that we're dealing with here simply says that no action may be maintained. I understand. Just because California amended its statute, it didn't have kind of a dead bang case on point like the Baker case here. So I'm a little bit baffled by the district court saying, well, the case law is slim, so we better look to Arizona. But when the case law is clear, why would either the district court or this court look to California law? Yeah, the Baker case did not hold that the second mortgage loan holder's debt was extinguished. It simply said that it was subject to the anti-deficiency statute in that situation and that it could not pursue an election of remedies. What did that word abolish mean? In terms of, when Baker said the legislative purpose was to abolish the liability, I think, I mean, I can't read the court's mind, but I believe it was saying that it was intended to provide a complete defense to a collection action and a deficiency situation. But the point here, Your Honor, is you have to look at the reasonableness of the investigation. And so, and we have, as I said earlier, you know, there's legions of authority, certainly in the credit reporting agency context, that the, that they are not required to look beyond the facts, that reinvestigation claims are not the proper vehicle for collaterally attacking the legal validity of consumer debts. You see that in the statute of limitations context. You see it in the assignment context. You see it in a number of different contexts where the courts say, look, this is about whether or not you're reporting the facts accurately and whether or not you're investigating the facts reasonably. And that is the case over and over and over again. Now, I think there are also, if you wanted to look beyond the statutory text and statutory structure here, I think there are also good policy reasons not to interpret inaccurate. To me, one thing for CRAs and something else for furnishers, whether or not a debtor has a good defense to a claim to collect on a debt, the fact that the debtor did not pay is still relevant to potential future creditors. That was one of the- So, are you basically saying, let's take a different hypothetical? Sure. Let's say that there's a, it's an unsecured debt and there's a Chapter 7 bankruptcy and the debt is discharged. Are you saying it's accurate to report to a credit agency that the debt is still owed? No. In that case, there are cases saying that where the debt has been discharged, it's gone. It's completely extinguished. Right. So, what's the functional difference here when Arizona law says you can't collect the deficiency? Well, you can't collect, I mean, so it's quite clear from the case law that the debt does still exist and there are a number of cases that we cited in our brief, including the Gottschalk case and the Lane case, which says, well, notwithstanding that the borrower would have a defense under the anti-deficiency statute, the debt still exists. You can still seek it, for example, from a guarantor. You can still seek it from an endorser and so on. You can still seek it from third parties. So it is factually accurate what Citi reported here. Now, I mean, I can understand the court's reluctance. No guarantors here, no third parties. I agree with that. The debt was extinguished. I mean, you couldn't collect on the debt. Is that accurate? I think we did not dispute that for purposes of summary judgment. We did not dispute that the ADS, the anti-deficiency statute, would apply here. But we certainly did dispute whether or not the debt was still in existence and could still be reported on. And that factual reporting was absolutely accurate. But look, I can understand. Why would you, if you can't collect on it, why would you keep accruing interest on it, knowing you can't collect on it, and reporting information that the debtor owes when he doesn't owe? Why would you? What's the purpose of accruing continued interest and late fees and all of that if you know you cannot collect? Well, there was certainly, in this case, Your Honor, there was sort of an attempt to charge off the debt internally at Citi Bank that kept being put on hold because of the Servicemembers Relief Act. And if you look at the notes, it's in the record at ER-443 for several pages, and ER-463 is an example, for example, where there's that sort of internal dialogue going back and forth where, you know, one side of Citi is basically saying, you know, we can charge this off, you know, we can charge this off. And another side is saying, no, we've got an SCRA exemption in play here. So that's sort of factually how that took place. But, Your Honor, I can, I think that you don't need to resolve the sort of broad issue of law versus fact in this case for a couple of reasons. The only claim at issue is the reasonableness of the investigation, and that's at the complaint at ER-1194. And as you know, he alleges the complaint was, or the investigation was unreasonable because Citi did not analyze the Arizona anti-deficiency statute and continue to report. Now that sole allegation was we disputed in summary judgment with our expert who described, for example, the fact that, you know, that the industry does not consider that to be And his belief was, in his opinion, was that the investigation was reasonable and that Citi did not have an obligation to report on that after the dispute was raised. And he goes, he describes that at ER-45 through 47. Now what did they, what was the response in return on whether or not the investigation was reasonable? What were the facts that they adduced in summary judgment? Well, Your Honor, there were none. And in fact, their expert admitted, and this is at ER-658 through 660, this is the Hendricks deposition, their expert admitted repeatedly that not offering an opinion that Citi, that he was not offering an opinion that Citi needed to determine the legal effect of the Arizona anti-deficiency statute. He was not offering an opinion that Citi needed to research or had any obligation to research the anti-deficiency statute. And he did not think that Citi's investigation was unreasonable for not doing those things. That was the record here on summary judgment. So I mean, I can understand if the court has some reluctance to get drawn into this theoretical debate over whether furnishers have to simply look at factual, only factual matters or whether they ever have to apply law to facts or what have you and potentially create this schism in the FCRA between CRAs and furnishers. But the court need not dive into that because it's clear that on this record, this summary judgment record, that there simply was no evidence that the investigation was unreasonable. Is that debt still out there then? Are these late fees still owed and accruing in your view? No, Your Honor. If you look at the credit reporting after the dispute, and this is at ER 386, the credit reporting after the dispute says recent, it says a cart account charged off $38,010 written off, and there is no balance listed there. So there is nothing that is still owed in the credit reporting after the dispute. And in fact, the credit reporting says in the comment, account information disputed by customer. So Citi did exactly what it was supposed to do. It listed the account as being disputed. The debt was charged off. Eventually. Eventually. Eventually. In April of 2018, and recall that the dispute was first made in February of 2018. That's when the dispute was raised. That's when Citi had an obligation to do an investigation. And the result of that investigation was it was charged off and that the dispute was listed. And I also note that the Citi also used the XB code when it responded to the dispute, which both experts admitted, or both experts said, that that XB code means that Citi mortgages reporting could have no impact on Gross's credit score. And you see that at ER 1071, where Citi's expert describes that. And you see that at ER 684 through 685, where the plaintiff's expert admits that in deposition. So what you have here, Your Honor, is a situation where, in our view, the Fair Credit Reporting Act system worked. You have a credit report that shows the first mortgage with CIT Bank and the second mortgage with Citi Mortgage both opened in January of 2007. It shows the CIT first mortgage was foreclosed in July of 2013. This is, again, at ER 386. And it shows that there was a balance that was charged off by Citi. Now, as I said, after- But in the interim, you had this internal investigation that said that you consulted the transactional notes and found that nothing would indicate the debt had been discharged, right? Prior to the investigation- Well, why wasn't that an investigation? Prior to- Because under the FCRA, they get a dispute and you go in and conduct an investigation. It's an internal investigation. You say the debt is owed, which it's not. Why isn't that an investigation? Well, what my understanding is what the plaintiff is allowed to sue for is whether or not, after a dispute was raised, whether or not the furnisher conducted a reasonable investigation. Yes. That's the claim in this case. And what I'm saying, Your Honor, is that the first indirect dispute, which is the type that can be raised, so you have to raise it with the credit reporting agency, which then relays the dispute to the furnisher, that that was first raised, I believe, in February of 2018. At that point, the investigation was done. The XB code was put in. It was noted as being disputed. No impact on Mr. Gross's credit score. And the amount was charged off. All of that happened within a couple of months after a dispute was raised. That's what we're here about. That's what they filed a lawsuit about. And that's, frankly, the only claim that they're entitled to file a lawsuit on. So why isn't that a question of fact, given what happened initially? I mean, if you had responded with the initial dispute and said, okay, we're wrong, we discharged the debt, period, then I think you have a point. But there's a prolonged period where you kept saying, now he's 180 days in arrears. Now he's- No, Your Honor. I mean, it looks, if I were reading the credit report, I'm just saying, they think he owes the debt. He doesn't think he owes the debt. And it keeps accruing. So that's how it was listed before the dispute was raised. After the dispute was raised, it was listed as charged off. It was listed as a disputed debt, which is exactly what Citi's supposed to do under Gorman. And in fact, there was only one instance where they said, where the plaintiff said that I applied for credit and I was damaged by this. Only one instance. And that's described in the Fifth Supplemental Interrogatory Response as the ER-1033. And that was Mr. Gross' application for a mortgage with a company called Starboard Financial. And this is what I mean by the FCRA worked here. Because when Starboard Financial analyzed his credit, and this is from ER-1039 to 1041, they concluded, they looked at the corrected credit report after the dispute. They concluded that the borrower had a foreclosure in 2013, that there was a waiting period met before, you know, so that that no longer affects his credit because a certain amount of time has elapsed. And they were able to determine, based on the credit that Citi Mortgage did, please note the second for that property is continuing to report on borrower's credit per Arizona state law. Creditors are not allowed to pursue deficiency judgments. And this has been documented and so forth. The Citi Mortgage account was thus omitted from the underwriting analysis. So the only instance of credit that they're complaining about, according to their interrogatories, number one, Citi Mortgage's credit reporting had no impact on his credit score. That's documented and testified to by both experts because the XP code that was put in after the dispute and Starboard Financial says, we're not going to consider it because it's all related to the foreclosure back in 2013. So Your Honor, I think here you have an instance where the FCRA worked, the dispute was noted, a future furnisher of credit looked at it, was able to reach the conclusions that they wanted to reach based on the factual information that they had. And on that basis, we don't believe, in addition to the fact that their expert admitted that Citi's investigation was appropriate, that we don't believe that on these facts there is any basis whatsoever for this case to proceed. If we were to disagree with you on whether there was a factual issue, then there would be factual issues on damages, for example, because they do claim emotional damages and that's not something that anyone has gotten into here for obvious reasons. But that would be a potential claim, correct? Well, in theory, yes, but in fact, no. And we describe the reasons why in our opposition brief. In fact, there can be no causal linkage between any alleged emotional distress and Citi's reporting here for the reasons that we state in our brief. And that's all in our opposition brief. So we don't believe there's any basis. Moreover, the lack of actual damages really means that there's no negligent claim here because that's all you can get there. And there's no evidence whatsoever of willful conduct here. So we think the entire case is ripe for affirmance on summary judgment. Thank you, Counsel.  Thank you. Thank you, Your Honor. I want to just point out, first off, I think Mr. Marshall may not have fully read our reply brief because he characterizes Mr. Hendricks' testimony, our expert's testimony, in a way that's consistent with their opposition. But we have directly rebutted and put for the court in our reply brief Mr. Hendricks' actual testimony verbatim for the court to read. Mr. Hendricks in no way, shape, or form acknowledged what Mr. Marshall is saying he acknowledged in his testimony. That's just completely not accurate. Mr. Hendricks explained that he is not going to make legal conclusions. He's referring to the extinguishment of the debt as it relates to the borrower. And so I think that the brief speaks for itself. But a couple other things. The XB code is immaterial here because as evidenced even by counsel's own argument, it required manual underwriting because when you remove an account with an XB code, creditors stop and say, well, what's really going on here? It required manual underwriting, which delayed Mr. Gross' ability to buy a mortgage by a matter of a few months. So even if he was ultimately approved and the underwriter was able to figure out apparently what city mortgage was unable to figure out, which is that it was not legally owed, then that's not a removal or elimination of damages. Finally, your honors asked some good questions about why would city continue to report the debt despite knowing they weren't going to try to collect it or unable to collect it. And simply because this is a known practice called debt parking. Creditors park debt on people's credit reports to pressure them into payment or coerce payment later. So for example, Mr. Gross goes to apply for a mortgage and they say, you've got this issue on your credit report, and then some people will go out and settle that with the creditor. And so creditors routinely park debt on credit reports that they are not actively trying to collect. It's a common practice. We address it in our brief. I want to also analogize, sorry, I'm going fast because I'm almost out of time, but that while a bankruptcy extinguishes a debt, it extinguishes the debt for the debtor. It doesn't extinguish the debt. It's very similar. It's analogous to the abolishment of the debt in the anti-deficiency statute because a creditor can continue to collect the debt after a bankruptcy against co-borrowers, co-signers, guarantors. There is no difference between the bankruptcy discharge and the abolishment of the debt. They both only protect the debtor. And that's what this report got wrong. And the cases that she cited was that she was looking at cases that allowed the existence of the debt to continue against third parties and other collateral. That's not what we have here. And finally, the last point, I guess, is that this really wasn't a legal conclusion. It really was, as Judge McKeown, sorry if I said that wrong, pointed out, that they had all of the information within their possession. They did not consider it. And as Ms. Bloom discussed, they did not consider it. They needed to at least consider the anti-deficiency statute and make a determination. We don't expect— That's essentially what your expert said. You know, he would characterize it that they failed to remember what they already knew. But— That's right. Just a moment. City's counsel said, apart from that, that your expert acknowledged that the investigation itself was reasonable. Do you agree with that claim? Absolutely not. He said the opposite. And the information is in the record. They did not look. Thank you. They failed to consider it. Thank you, Your Honor. And I just wanted to point out, with respect to the information and the investigation, you can't conduct a reasonable investigation if you don't even address the things that are being disputed in the dispute. And they never looked at it. They never looked. Their only testimony on what they investigated had nothing to do with the issue that Mr. Gross disputed. And had they done so, had they consulted legal counsel in-house and said, we disagree, it's possible they would have gotten it right. It's possible they would have gotten it wrong. And that may have been a reasonable investigation. I think that's ultimately the government's position, is that they got to try. And they didn't even try. Thank you, counsel. You're over your time. Thank you. Thank you all for your arguments this afternoon. The case just argued will be submitted for decision. And we'll proceed to the next case on the oral argument calendar, which is McDougall versus American Honda. Thank you.
judges: THOMAS, McKEOWN, Molloy